UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

| | | |
|---|---|---|
| Wilbur Allmond, | § | CIVIL ACTION NO. 4:05-CV- 00096 (HL) |
| Plaintiff | § | |
| | § | |
| vs. | § | |
| | § | |
| | § | |
| Akal Security, Inc. and Alberto Gonzales, | § | |
| Attorney General of the United States, | § | |
| Defendants | § | A JURY IS DEMANDED |

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
AND SUPPORTING MEMORANDUM**

Plaintiff Wilbur "Gene" Allmond files this motion for partial summary judgment, as authorized by Federal Rule of Civil Procedure 56, because Defendants Akal Security, Inc. ("Akal") and Alberto Gonzales, Attorney General of the United States ("Government") have allowed stereotypes and assumptions rather than reasoned, individualized assessments to guide their actions. This cost a good employee his job and violated the Americans with Disabilities Act and the Rehabilitation Act of 1973.[1] While recognizing that a trial is still necessary, the Plaintiff believes that it is appropriate to narrow the issues to simplify the trial.

Summary judgment is sought on three grounds: (1) Plaintiff has a disability in that he was regarded as having a substantial hearing impairment; (2) the Government's hearing aid ban violates the law; and (3) Akal is liable for the Government's violations of disability law.

---

[1] The Americans With Disabilities Act and the Rehabilitation Act are intertwined statutes, with the ADA applying to private entities and the Rehabilitation Act applying to governmental entities. Because the Rehabilitation Act provides that the standards of the ADA are to be used in determining whether the Rehabilitation Act has been violated in the employment context, the two statutes apply identically here. 29 U.S.C. § 794(d). *See also Branham v. Snow*, 392 F.3d 896, 902 (7th Cir. 2004).

1

## I.  Summary of Argument

Plaintiff was "one of the best, if not the best" CSO during the nearly one year he worked at the federal courthouse in Columbus, Georgia.  (Smith Dep. at 6)[2].   He lost his job nonetheless.

Plaintiff files this motion because the Government has admitted that it regarded him as having a disability.  It pronounced him in plain terms as having a "severe conversational hearing loss" and removed him from his Court Security Officer job because of his hearing impairment.  Thus, the Government perceived him having a substantial limitation in the major life activity of hearing, as a matter of law.

Defendants have also violated disability law by utilizing standards that have the effect of discriminating on the basis of disability.  In this case, by banning hearing aids to pass the required hearing tests, defendants have screened out those with hearing disabilities.  The ADA makes this kind of blanket ban unlawful, unless the party employing such a standard proves the affirmative defense of "business necessity."  42 U.S.C. §12113.   Because there is no objective or medical evidence to support it, this ban cannot stand.

Dr. Richard Miller, the architect of the "no hearing aids" screening standard, even admits that, paradoxically, the CSO who has good hearing with aids is excluded from the job while the CSO with substantial hearing loss can work.  As will be demonstrated below, there is no necessity for this dysfunctional screening standard.

Finally, although Akal has consistently argued that it merely acted on the Government's orders and did not deem Plaintiff as having a disability, it is liable for the United States Marshal Service's disqualification of him under 42 U.S.C. §12112(b)(2).  This statutory provision

---

[2]  This deposition excerpt is attached as Exhibit G to the Plaintiff's Motion to Exclude Expert Witness (Doc. 72).

provides that, by participating in a contractual relationship that subjected the Plaintiff to discrimination, Akal has violated the ADA. 42 U.S.C. §12112(b)(2). The ADA does not allow any employer to turn a blind eye to discrimination by letting others make employment decisions.

## II. Summary Judgment Evidence[3]

Plaintiff relies on the following summary judgment evidence, which is attached:

Exhibit A - Government's Notice of Disqualification of Allmond because of "severe conversational hearing loss."

Exhibit B - Old Government Qualification Standard for Hearing (hearing aids permitted to be used provided tests can be passed using such hearing aids)

Exhibit C - Current Government Qualification Standard for Hearing (hearing aids not allowed for hearing tests)

Exhibit D - Government listing of essential job functions related to hearing skills

Exhibit E - Testimony and exhibits of Akal representative Dev Suroop Khalsa

Exhibit F - Testimony of Government witness Thomas Galgon

Exhibit G - Testimony of Government witness Dr. Richard Miller, author of the current ban on hearing aids and reviewing official for all medical disqualifications

Exhibit H - Testimony of Government witness Dr. Louis Chelton, who disqualified Allmond for having a "severe conversational hearing loss."

Exhibit I - Testimony of Government witness Dr. John Barson, co worker of Dr. Miller and Dr. Chelton

Exhibit J - Affidavit of Dr. Todd Ricketts, Professor of Audiology, Vanderbilt University School of Medicine, and expert witness for Allmond

Exhibit K - Affidavit of Wilbur Allmond, Plaintiff

---

[3]The summary judgment evidence exhibits apply to all issues. Where appropriate, Plaintiff has cited the page and line of the applicable deposition testimony from the court reporter's record.

Exhibit L - Opinion in *Wise v. Akal Security, Inc*., 2005 WL 3487741 (W.D.Tex. Dec. 21, 2005)

Exhibit M - Affidavit of Katherine Butler to authenticate records

Exhibit N - Letter of January 22, 2001, from Akal to Government regarding illegality of new Government qualification standards

Exhibit O - Government's answers to interrogatories detailing Allmond's limitations in the major life activity of hearing

Exhibit P - Government's production of documents detailing legal action against state and local law enforcement agencies that ban hearing aids to pass tests

Exhibit Q - Government testimony admitting that the CSO position rates 22 on a scale of 0-225 in degree of stress and difficulty

Exhibit R - Government Description of the CSO Program

Exhibit S – Testimony of Government expert Dr. Marc Kramer

### III.  Standard of Review

A summary judgment is proper when, viewing the evidence in the light most favorable to the nonmoving party, no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law.  *See San Pedro v. U.S.,* 79 F.3d 1065, 1068 (11th Cir. 1996); FED. R. CIV. P. 56 ©).  This rule applies in the context of "regarded as" disability cases as well.  *See Rodriguez vs. Conagra Grocery Product Co*., 436 F.3d 468 (5th Cir. 2006) (ADA), and *Scharff v. Frank,* 791 F.Supp. 182 (S.D.Ohio 1991) (Rehabilitation Act).

Here, summary judgment is sought both on claims on which Plaintiff has the burden of proof, and a claim on which Defendants have the burden of proof – the affirmative defense of business necessity.  In each case, summary judgment is appropriately granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322  (1986)**.**

### IV.  Background

In March 2003, Plaintiff was hired to work as a Court Security Officer ("CSO") by Akal Security, Inc., a contractor of the United States Marshal's Service.  Akal contracts with the United States Marshal's Service to provide court security officers at federal court houses throughout the country.  Exh. K.

Allmond came to the CSO job from a career in  law enforcement with the Columbus, Georgia, Police Department, where he worked for almost 30 years as a sergeant, detective and supervisor.   He performed the CSO job without any difficulty for almost a year before the Government removed him from the job, not because of any issue with job performance, but because of its perception of his "severe conversational hearing loss."  Exh. K.   On February 3, 2004, Allmond was told that he had lost his job because of a hearing test he had taken (without hearing aids).  Ironically, the test was taken nine months before he was dismissed.  *See* Exh. A. The Government ordered Allmond removed from his job because of its view that he had a "severe conversational hearing loss," which precluded him from hearing face-to-face conversations, from hearing telephone conversations, and from hearing well enough to know where sounds were coming from.  Exh. A; O.

While Akal, not the Government, was Allmond's titular employer, Akal dismissed Allmond immediately upon the Government's order, because it had given the Government absolute power to order any CSO to be removed from the job because of perceived medical issues.  Exh. D, p. 169, lines 8-18.   By contract, the sole authority to remove a CSO for

perceived disabilities rests with the Government.  Neither Akal nor the removed CSO had any

right to appeal the Government's removal decision.  Exh. D, pp. 96-99.

Sadly, Allmond lost his job despite the fact that both the Government and Akal agree that

Allmond had, in fact, demonstrated the ability to perform the essential functions of the job.  Exh.

F, p. 10, ll. 17-22; p. 20, ll. 13-20; p. 25, l. 20 to p. 26, l. 10 (testimony of Government

representative) and Exh. E (testimony of Akal representative), p. 66, l.18 to p. 67, l. 4.

## V. Issues

### A. Regarded as Having a Disability in Hearing

An individual is impermissibly "regarded as" having a disability if he: (1) has a physical

or mental impairment that does not substantially limit major life activities, but is treated as such

by an employer or (2) has no actual impairment at all, but is treated by an employer as having a

substantially limiting impairment. *Sutton v. United Airlines,* 571 U.S. 471, 489 (1999).  The

*Sutton* court explained that such misperceptions often result from stereotypic assumptions that

are not indicative of individual ability.  *Id.*   This is precisely what cost Allmond his job.  There

is no doubt but that Allmond performed the job of CSO for almost a year and performed it well.

But there is also no doubt that this mattered not at all to the Defendants, who dismissed him

summarily upon being told that he was hard of hearing.

The Plaintiff thus seeks summary judgment on the ground that he was "regarded as"

having disability in the major life activity of hearing.  Clearly, Allmond's hearing loss is an

impairment under the law and hearing is a major life activity.  29 CFR §1630.2.[4]   The question

---

[4]Plaintiff also asserts that Defendants regarded him as having a disability in the major life activity of working.
However, the Court need not sift through the immense record on that issue given the Government's admission that it
regarded Allmond as having as having a disability in hearing.  The Government's own physicians, albeit not experts,
have admitted that these skills are *common* to the class of law enforcement jobs.  It is obvious that a person who

for this motion is how Defendants *viewed* this impairment.   It is, after all, illegal to stereotype

someone because of a medical condition.   Here, the Government jumped to conclusions from a

hearing test, branded Allmond as hard of hearing, and then ordered him removed from the job.

But, before making that decision, the Government never checked with anyone who worked with

Allmond about whether he was actually capable of doing the tasks required of a CSO.  Exh. G,

pp. 229-234.   In truth, the record demonstrates that he was judged by his superiors as one of the

best CSOs in the Columbus courthouse.

        The Government did exactly what the disability laws prohibit.  It acted without any

individualized assessment of Allmond's ability to do the CSO job.  Exh. H, p. 91, ll. 9-15 and

Exh. G, pp. 231-234.  Sadly, the Government did not even have anyone with any expertise in

audiology involved in his removal.  Exh. H, p. 36, l. 24 to p. 37, l. 6.   Thus, it also acted without

any expert medical assessment of his condition.  It just engaged in knee-jerk assumptions about

his hearing loss, which the Eleventh Circuit recognizes as both illegal and extremely damaging.

The Court recently held in *D'Angelo v. Conagra Foods, Inc*, 422 F.3d 1220, 1236-37 (11th Cir.

2005), that:

> society's accumulated myths and fears about disability and disease are as
> handicapping as are the physical limitations that flow from actual impairment....
> The Act is carefully structured to replace such reflexive reactions to actual or
> perceived handicaps with actions based on *reasoned and medically sound
> judgments*:  the definition of "handicapped individual" is broad, but only those
> individuals who are both handicapped *and* otherwise qualified are eligible for
> relief.

---

cannot hear face to face conversations would be knocked out of virtually *all* law enforcement jobs.   In the event
Defendants raise this issue in their Rule 56 papers, Allmond will respond with overwhelming summary judgment
evidence proving that a person with a severe conversational hearing loss would be precluded from virtually all jobs
in the law enforcement class of jobs.  *See Williams v. Philadelphia Hous. Auth. Police Dept.,* 380 F.3d 751, 764-65
(3d Cir.2004);  *McKenzie v. Dovala,* 242 F.3d 967, 971-72 (10th Cir.2001); *Rodriguez vs. Conagra Grocery Product
Co.,* 436 F.3d 468 (5th Cir. 2006);  *Smaw v. Va. Dept. of State Police,* 862 F.Supp. 1469, 1475 (E.D.Va.1994).

In the *D'Angelo* case, the Eleventh Circuit cautioned against "discrimination on the basis of mythology."

Other Courts share the Eleventh Circuit's view. In one such case, *McInnis v. Alamo Community College Dist.,* 207 F.3d 276, 280 (5th Cir. 2000), the Court held that liability attaches when the Plaintiff "establishes that the impairment, if it existed as perceived, would be substantially limiting." In other words, "an individual may be regarded as disabled if he has a physical or mental impairment that does not substantially limit major life activities but nonetheless is *treated* by a covered entity as constituting such a limitation." *Id.* The Government ran afoul of this provision.

Summary judgment for the plaintiff is rarely sought in "regarded as" disability cases because most parties do not admit, in writing, that they have branded a person as having a "severe conversational hearing loss." But that is precisely what has occurred here. The Government branded Allmond as hard of hearing and then acted on that perception, warranting summary judgment on this issue. Exh. A*; see also Rodriguez v. Conagra Grocery Products Co*., 436 F.3d 468, 482-83 (5th Cir. 2006), and *Scharff v. Frank,* 791 F.Supp. 182, 186-87 (S.D.Ohio 1991).

Defendants' perception led the Government to concede in answers to interrogatories that Allmond's severe conversational hearing loss caused him to be substantially impaired in comprehending speech 1) during face-to-face conversations, 2) during telephone conversations, 3) during radio transmissions, and 4) when he cannot see the party who is speaking. Exh. O. On the basis of these misperceptions, the Government branded Allmond a substantial risk, not only to himself, but to the health and safety of the public and other law enforcement officers. Exh. A.

The Government's perceptions, if accurate, would not just mean it treated him as hard of hearing. It would also disqualify Allmond from the entire field of law enforcement, where he has spent his career.[5] In fact, Thomas Galgon, the Chief Inspector of Judicial Protective Services for the United States Marshal's Service, admits just that. Exh. F at 93.

Defendants have never supplemented discovery or retreated one inch from the position that Allmond has a severe hearing loss and that he was dismissed for this reason. Summary judgment is thus clearly appropriate.

### B. Violation of 42 U.S.C. §12112(b)-Discriminatory Standards and the Defendants' Business Necessity Defense

The ADA plainly defines unlawful discrimination as "utilizing standards...that have the effect of discrimination on the basis of disability." 42 U.S.C. §12112(b)(3). Likewise, 42 U.S.C. §12112(b)(6) defines unlawful discrimination as "using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities." The Government has violated these provisions by banning hearing aids for all people who need them to pass required hearing tests.

Clearly, the standards utilized by the Defendants, on their face, discriminate on the basis of a disability in hearing. The Government employee who actually disqualified Allmond, Dr. Louis Chelton, candidly admitted this, acknowledging that the hearing aid ban screens out hearing impaired "folks who need hearing aids to pass those tests." Exh. H, p. 80, ll. 6-11.

---

[5]Although Plaintiff does not move for judgment as a matter of law with respect to the defendants regarding him as having a disability in *working*, it is worth pointing out that a person as hard of hearing as the defendants assert (unable to understand conversations face to face), there would be few jobs, if any, for such a severely hearing impaired individual.

And it is undisputed that the Government bans those who need hearing aids to pass the hearing tests from working as CSOs.   Exh. H, pp. 75-80.  This ban screens out those individuals who need hearing aids – i.e., those with significant hearing impairments.  Since this qualification standard (the "no hearing aids" rule) screens out those with disabilities, it violates the ADA as a matter of law, 42 U.S.C. §12112(b)(6), unless the Defendants can establish their affirmative defense and prove that a ban on hearing aids is job-related and consistent with business necessity.  42 U.S.C. §12113; 29 U.S.C. §794(d).   Neither can do so.

The standard for proving that a standard is job-related and consistent with business necessity is "stringent."   *See Morton v. United Parcel Service, Inc.*, 272 F.3d 1249, 1263-1265 (9th Cir. 2001), *cert. denied*, 535 U.S. 1054 (2002); *Belk v. Southwestern Bell Telephone Co.*, 194 F.3d 946 (8th Cir. 1999); *Hoehn v. International Sec. Services and Investigations, Inc.*, 120 F. Supp. 2d 257 (W.D.N.Y. 2000); *EEOC v. Houston Area Sheet Metal Joint Apprenticeship Committee*, 2002 WL 1263893 (S.D. Tex. 2002).  The employer must show that its ban on the use of hearing aids to pass the hearing tests is vital, not just that it is merely convenient or expedient.  *Conroy  v. New York State Dept. of Correctional Services*, 333 F.3d 88, 97-98 (2d Cir. 2003).

The business necessity defense requires objective evidence – the opposite of unproven fears and stereotypes.[6]   The objective evidence establishes the exact opposite of business necessity.  It is illogical and does not promote safety.

   **1.  The Government's Business Necessity Defense Fails as a Matter of Law.**

A clear sign that the ban is not supported by business necessity is that no medical evidence supports it.  In fact, even the architect of the hearing aid ban, Government employee Dr. Richard Miller, conceded that he had no idea whether there was any business necessity for the ban.  Exh. G, p. 96 line 5.   He also admits he is no expert in hearing.  And no expert witness claims to have participated in imposing this ban or claims to think it justified by business necessity.[7]   Indeed, how could any expert claim authorship of such a ban when the Government admits that it *rejects* CSOs who actually hear *better* than those it accepts?[8]  Exh. G, pp 39-40.

The Government knows well that objective medical evidence is required to support such an across-the-board ban.  In fact, the Government has repeatedly taken legal action against local governments who maintain a ban on hearing aids for law enforcement personnel.  For example, when the City and County of Honolulu had a ban that prohibited individuals from working as

---

[6]*EEOC Enforcement Guidance on Disability-Related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Act (ADA)*, Questions 5 and 6 (July 26, 2000),
http://www.eeoc.gov/policy/docs/guidance-inquiries.html; *EEOC Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities*, Question 14 (March 25, 1997),
http://www.eeoc.gov/policy/docs/psych.html; *Vindiola v. United States Postal Service*, Dkt. No. 07A20046 (EEOC Sep. 16, 2003).   *See also Jackson v. Lake County*, 2003 WL 22127743, at *10-11 (N.D. Ill. Sep. 15, 2003) (courts use an objective standard).

[7]Although a party asserting the business necessity affirmative defense must provide objective medical evidence to support a medical standard, Akal and the Government  have named only one ostensible expert, an audiologist. However, this expert admitted that he was not hired to offer opinions on the business necessity  defenses, and he has offered none.

[8]As is shown in Plaintiff's motion to exclude Dr. Kramer's opinions, the Government rejects CSOs who actually hear *better* than those it will accept, by allowing individuals with "mediocre" hearing to work while banning those who, with hearing aids, have near normal hearing skills.

11

police officers if they failed a hearing test without hearing aids, the Government intervened and demanded that Honolulu produce "medical evidence" justifying a blanket ban. Exh. P1 at 9. Likewise, when Cobb County, Georgia, maintained a similar policy for law enforcement personnel, the Government again demanded that "medical evidence" be produced supporting the County's decision. Exh. P2 at 10-11. Like these Defendants, the local governments had no medical evidence to proffer. In both cases, the local governments agreed to change their standard. Exh. P1 at 32-35; P2 at 13-17.

The Government, which instituted the ban, has not a single witness nor one shred of evidence to *prove* that this standard, which screens out those with hearing disabilities, is job related and consistent with business necessity.[9] That is what it must prove to make the affirmative defense. Saying it does not make it so. *Roberts v. Rayonier, Inc.,* 2005 WL 3500320 at * 2 (M.D. Fla. Dec. 21, 2005) (business necessity defense failed as a matter of law and summary judgment granted in favor of employee). Like that case, there is no evidence to prove the defense, since all the Government has is argument.

Without any objective medical evidence to support the ban, all the Government has left is a host of fears about battery failure, the dislodging of hearing aids, and other such rank speculation. It is likely that Defendants will parade out this list of fears in the Rule 56 papers, but of course Defendants' burden is not that of argument or lists of fears: the burden is to prove the defense with admissible evidence. And this, Defendants cannot do. They have not provided proof of this defense in discovery and they cannot tender proof now.

---

[9]  As pointed out in the Plaintiff's Motion to Disqualify Marc Kramer as an Expert Witness, the "no hearing aid" standard is not job-related. (Doc. 72 at 4). While the Government claims that CSOs must be able to do six hearing tasks, CSOs are cleared for duty despite the fact that, from an audiological perspective, they are "assumed" not to be able to do the very tasks that the government deems essential. *Id.*

12

Although the burden is on the party *asserting* an affirmative defense, Plaintiff tenders the Declaration of Dr. Todd Ricketts, who testifies that he has scoured the literature and contacted the Federal Drug Administration (FDA) to determine if there was any scientific or evidence based justifications for the irrational fears proposed by the defendants. Either the fears are substantiated or not. He confirms that they are not. Exh. J. To the contrary, Dr. Ricketts explains that hearing aids are efficacious, and not a significant risk of harm to anyone. More importantly, there are many different types of hearing aids, and they are all banned regardless of their individual properties. Dr. Ricketts explains that since the Government allows people to work as CSOs who have mediocre hearing (without hearing aids) as demonstrated by an audiogram, and refuses to allow those who have good hearing skills with hearing aids, the Judiciary is actually at *more* risk with the unaided CSOs with mediocre hearing than with those CSOs who hear well with aids. How can Defendants reasonably propose that this ban is job-related and justified by business necessity when those with worse hearing may continue guarding the Judiciary? The question presents its own obvious answer.

It is not just Dr. Ricketts who has searched in vain for any objective data supporting a hearing aid ban. Defendants themselves admit that they cannot identify a single incident in the history of law enforcement where a hearing aid issue caused harm to anyone. Exh. H, p. 72 line 12. And the architect of the ban, Dr. Miller, says he does not know of any other law enforcement agency with such a ban. Exh. G, pp. 13, line 12 to p. 14, line 14. He admits that he has no studies, no experience and no back up for the ban, and that, because of the ban, CSOs with good hearing skills are rejected in favor of those with worse hearing. Exh. G, p. 31, line 23, p. 39, lines 14-25, p. He also admits that there was nothing to prevent him from determining whether

13

his fears were substantiated or not.  Exh. G, p. 193, line 24 to p. 234, line 13.  But he did not do so.

Another clear sign that the ban is not supported by business necessity is that the Government bans hearing aids only for passing the tests, but allows their use on the job. Logically, if hearing aids present the kinds of problems that the Defendants conjure up (admittedly without evidence), they present them as much in the real world of performing the CSO job as they do in the sound proof booth where hearing tests take place.   If, for example, Defendants' concerns about electronic interference are not applicable on the job, how can they be valid concerns (much less a business necessity) when testing hearing?

The facts of this case demonstrate precisely why Congress enacted the ADA and the Rehabilitation Act.  By imposing a blanket ban on hearing aids to pass the tests, and performing no individualized assessment of the individual's abilities with medically appropriate hearing aids, the Government has created the absurd situation where people who hear just fine using hearing aids are banned while those who have mediocre hearing skills are guarding the Judiciary and the public.  This is not business necessity.  It is business absurdity.

## 2.  Akal's Affirmative Defense Also Fails as a Matter of Law[10]

Akal's assertion of the affirmative defense of business necessity is even more astounding. Akal has repeatedly admitted that is does *not* think the ban is necessary and that CSOs should *not* be removed because of it.  Akal admitted that it knew the standards were illegal even before they went into effect.  Exh. N.  At that time, it warned the Government that "no employer can medically disqualify an employee from a position simply because they are identified as a

---

[10]Akal pled the "direct threat" defense, but it is no longer asserting it.

14

member of a disabled group." *Id.* at 2.   Akal advised the Government that, before an employee could be properly disqualified, the ADA requires a "case by case analysis" of whether he could perform the essential functions of the job "with or without reasonable accommodation."  *Id.* at 1.

Akal admits that it disagreed with the Government's actions, and attempted to appeal *every single one* of these disqualifications until the Government ordered Akal to stop doing so, because no appeals were allowed to second guess the Government, no matter how wrongful or illegal a disqualification was.  Exh. E (showing from the excerpts from pages 138 through the end of the exhibit, that Akal never believed the screening criteria to be necessary or lawful).

It is unusual, to say the least, to see Akal claim now that the medical standards are supported by business necessity when, at the time they were implemented, it admitted that they were unlawful and may "expose both Akal and the USMS to liability under the Rehabilitation Act of 1973 [and] the Americans with Disabilities Act."  Exh. N at 1.   Not only did Akal notify the Government of these defects, it specifically complained to the Government that the new standards did not allow "a mechanism to test the CSOs' corrected hearing to determine if it would be adequate."  *Id.* at 3.  Akal's own words show that summary judgment is appropriate. The evidence shows that Akal has known from the very beginning that there was no business necessity for the Government's blanket ban.

### C. Violation of 42 U.S.C. §12112(b)(2)-Discrimination by Contract

Finally, by agreeing to defer to and act upon any Government decision about its employees' medical conditions, Defendant Akal has violated 42 U.S.C. §12112(b)(2) as a matter of law.  Common sense counsels that an employer should not be able to insulate itself from

liability for disability discrimination by saying "someone else made me do it." The statute says likewise and prohibits any employer from

> participating in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's qualified applicant or employee with a disability to the discrimination prohibited by this subchapter.

Akal violated this provision by entering into a contract that expressly delegates to the Government the power to remove Akal's employees from service. Exh. E, p. 168, ll. 9-25, p. 169, ll. 8-18. Akal has agreed to accept and act on any decision that the Government makes about any Akal employee perceived by the Government as having disabilities. This is confirmed by the sworn testimony of Akal, which outlines Akal's inability, due to the contract, to contest or prevent a CSO's removal after the Government has made its decision. *Id.* This is so even if the decision is based upon discriminatory standards that are unlawful. *Id.*

Strangely, Akal signed this contract, knowing in advance that it was illegal. Akal wrote to the Government in 2001, notifying it that the new qualification standards (at issue in this lawsuit) would lead to litigation because they were not job related and consistent with business necessity and would thereby violate the ADA and the Rehabilitation Act. Akal understandably implored the Government to evaluate CSOs on their actual abilities, and even volunteered to conduct such evaluations. Exh. N. at 4. Akal recognized that only an individual assessment of an individual's ability to do the job was lawful. *Id.* at 1, 2.

But, when the Government did not yield, Akal voluntarily chose to enter into a contract that defers to the Government in all removal decisions, with full knowledge of the legal and practical consequences of this illegal arrangement. This is a black letter violation of 42 U.S.C. 12112(b)(2). Since Akal had knowledge, in advance, of the illegality of this protocol, Akal is

16

also subject to exemplary damages.  It could have simply said "no" and avoided this clear

violation of law, but it did not.   It repeatedly signed contracts with the Government,

surrendering its employees to unlawful disability discrimination at the hands of the same

Government that sues state and local law enforcement agencies when they do the same thing.

Exh. P.

The ADA does not permit an employer to bury its head in this fashion.  The Courts have

held that "[e]mployers do not escape their legal obligations under the ADA by contracting out

certain hiring and personnel functions to third parties." *Holiday v. City of Chattanooga,* 206 F.3d

637, 645 (6th Cir.2000).   In *Holiday*, the Court concluded that the City of Chattanooga could

not delegate its duties under the Rehabilitation Act to a third party with an "unsubstantiated and

cursory medical opinion" in determining whether an employee was qualified for a job.  *Id*.  The

Fifth Circuit recently came to the same common sense conclusion.  *See Rodriguez vs. Conagra*

*Grocery Product Co*., 436 F.3d 468, 484 (5th Cir. 2006).   There, the Court pointed out that "[t]he

employer has an obligation to ensure that its applicants are treated as individuals; 'thus the

employer cannot slavishly defer to a physicians's opinion without first pausing to assess the

objective reasonableness of the physician's conclusions.'"

Significantly, Akal was found in violation of this very statute in a related case involving a

CSO named Gilberto Wise.  *See Wise v. Akal Security, Inc*., 2005 WL 3487741 (W.D.Tex. Dec.

21, 2005).   There, the District Court held:

> Although in this case, the USMS imposed the medical screenings upon Akal and
> its employees, Akal is prohibited from relying upon the physician retained by the
> USMS and its contractual agreements with both the USMS and Union to avoid its
> ADA obligations.

2005 WL 3487741 at *3.

17

As the *Wise* court and many others have held, Defendants cannot wash their hands of disability discrimination by simply contracting to others the right to unlawfully discriminate against those with disabilities.  This is a clear violation of the statute.  Plaintiff is entitled to summary judgment on  this pure question of law.

## Conclusion

There was never an individualized assessment of the Plaintiff, due to the blanket ban on hearing aids.  By lumping people together, branding them as having "severe" hearing loss,  and screening out those with disabilities is unlawful unless it is absolutely necessary, as proven by sound science and objective evidence.  Defendants admitted they thought Allmond had a severe hearing limitation and removed him despite the fact that all parties agree he could perform the job.  Plaintiff asks this court to grant his motion for partial summary judgment and enter an order finding that Defendant has regarded Plaintiff as having a disability under the statute. Furthermore, Plaintiff also asks that the Court grant his motion for summary judgment that the Defendants have violated 42 U.S.C. §12112(b)(2), (3) and (6) on the basis of their contract as well as the qualification standard that cost him his job.  He further seeks summary judgment on the Defendants' business necessity affirmative defense, as well as any and all other relief to which he may be entitled at law and equity.

Respectfully submitted,

s/ John Griffin
(with express permission)
Texas Bar No. 08460300
Houston, Marek & Griffin, L.L.P.
One Twenty Main Place, 3rd Floor
Victoria, Texas 77902
(361) 573-5500
(361) 573-5040 (fax)

E-mail: jwg@lawhmg.com

s/ Katherine L. Butler
Texas Bar No. 03526300
Butler & Harris
1007 Heights Boulevard
Houston, Texas 77008
(713) 526-5677
(713) 526-5691 (fax)
E-mail: kathy@butlerharris.com

s/ Janet E. Hill, Esq.
(with express permission)
Georgia Bar No. 354230
Attorney for Plaintiff
**HILL & BEASLEY, LLP**
1160 South Milledge Ave, Suite 140
Post Office Box 307
Athens, Georgia 30603
Telephone: (706) 353-7272
Facsimile: (706) 549-8446
E-mail: janetehill@bellsouth.net

**Certificate of Service**

I certify that a true and correct copy of this document has been served upon the defendants' counsel on the 3rd day of July 2006, as follows:

Kurt Peterson (by electronic filing)
Littler Mendelson
3348 Peachtree Road N.E., Suite 1100
Atlanta, GA   30326-1808

Jack B. Hood (by electronic filing)
Assistant United States Attorney
1801 4th Avenue, North
Birmingham, Alabama 35203-2103

s/ Katherine L. Butler