# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# COLUMBUS DIVISION

WILBUR ALLMOND,            :
                                     :
     **Plaintiff**,                :
                                     :
     v.                       :       Civil Action No. 4:05-cv-96(HL)
                                     :
**AKAL SECURITY, INC. and**     :
**ALBERTO GONZALES, Attorney**  :
**General of the United States,**    :
                                     :
     **Defendants**.            :
_____

## ORDER

This matter is before the Court on the Motion for Summary Judgment (Doc. 74) of Defendants Akal Security, Inc. and Alberto Gonzales, Attorney General of the United States, in his official capacity, and the Motion for Partial Summary Judgment (Doc. 80) of Plaintiff Wilbur Allmond. The Court heard oral argument on the Motions on December 19, 2006. After consideration of the pleadings, depositions, answers to interrogatories, admissions, and affidavits, and the arguments of the parties, and as more fully set forth below, the Court grants the Motion of Defendants and denies the Motion of Plaintiff.

## I.    FINDINGS

From April 1, 2003, until February 3, 2004, Wilbur Allmond was employed as a Court Security Officer ("CSO") by Akal Security, Inc. ("Akal"). Akal is a contractor to the United States Marshal's Service ("USMS"), and provides CSOs for the federal courthouses within the Eleventh Circuit. At the time of the events giving rise to this suit, Allmond was a CSO

at the federal courthouse in Columbus, Georgia.

At the time he went to work for Akal, Allmond was 55 years-old. Before working at Akal, Allmond had worked as a law enforcement officer, accumulating 36 years of law enforcement experience. Allmond was not aware of having any hearing problems during his time as a law enforcement officer and did not wear hearing aids at the time he applied to work at Akal. (Allmond Dep. at 15, Doc. 128.)

As a new applicant at Akal, Allmond was required to take a medical examination, which included a hearing test. Since January of 2001, the USMS has required that its CSOs meet the hearing requirements of the physical exam without the use of hearing aids. (Pl.'s Resp. Defs.' Statement Material Facts ¶ 41, Doc. 97.) However, the USMS allows its CSOs to use hearing aids on the job. (Id. ¶ 42.) CSOs who wear hearing aids and who pass the hearing test unaided must have their aided tests reviewed to ensure that the CSOs' hearing aids are functioning. (Id. ¶ 43.)

At the time that Allmond took his physical exam, the initial threshold requirements were as follows[1]:

> Initially all CSOs are tested UNAIDED using a pure tone, air conduction audiogram (audiometer) for measurement, testing each ear separately. . . .

---

[1] Under the heading "Current Government Qualification Standard for Hearing" (Pl.'s Summ. J. Evid., Doc. 101-1, Ex. C.), Allmond has offered a document labeled as "modification M032." (Id.) Defendants' witness, Marc A. Farmer, states in his Declaration, "On December 18, 2002, the USMS issued contract modification No. M032, which spelled out in great detail the hearing standards and protocols that had been utilized since the beginning of the revised medical program." (Defs.' Evid. Materials, Doc. 78-2 ¶ 14.) The Court will assume, therefore, that Modification M032 states the standard in place at the time Allmond took his physical exam.

(i)     In the frequency range from 500-2000 hertz (Hz), the pure tone audiometric deficit must not exceed 30 decibels (dB) in either ear, without the use of hearing aids.

(ii)    At 3000 Hz, the pure tone audiometric deficit must not exceed 40 dB in either ear, without the use of hearing aids.

(iii)   At 4000 Hz, the pure tone audiometric deficit must not exceed 50 dB in either ear, without the use of hearing aids.

(Pl.'s Summ. J. Evid. Doc. 101-4 at 1.)  If the unaided pure tone audiogram is failed and the applicant does not wear a hearing aid, the applicant must undergo unaided functional hearing assessments.  (Id. at 2.)  The requirements for the functional hearing tests are as follows:

(i)     Unaided hearing loss between the two ears must not differ by 25 dB or more at three of the four speech frequencies, i.e., 500, 1000, 2000, and 3000 Hz. (Measures the ability to localize sounds.)

(ii)    Unaided Speech Reception Threshold must be 30 dB or better in at least one ear.  (Measures the ability to hear sounds that alert to danger.)

(iii)   Unaided Speech Recognition in quiet must be 90% or above in each ear.

(iv)    Unaided Speech Recognition in a noise sound field must be 50% or above.

(Id. at 2-3.)  Under the standards in place, an applicant could have moderate hearing loss and still work as a CSO as long as he or she met the hearing standards unaided.  (Pl.'s Summ. J. Evid., Doc. 101-9 at 39.)  An applicant who could not meet the hearing standards without the use of hearing aids would not be allowed to work.  (Id. at 39-41.)

Allmond completed the medical examination, including the hearing test, on February 1, 2003.  Immediately following the examination, Allmond was told by the

examining physician that he did not do well on the hearing portion of the test. (Allmond Dep. at 16.) That was the first time Allmond became aware that he had a hearing problem. (Allmond Dep. at 15, 63-64.) In completing the hearing portion of the examination, the examining physician noted, "The examinee does not wear a hearing aid." (Pl.'s Summ. J. Evid., Doc. 104-7 at 12.) In the Examination Summary, the physician noted the following under the heading "Significant Findings": "Patient's hearing exam seems to be suboptimal according to written guidelines provided in this pamphlet." (Pl.'s Summ. J. Evid., Doc. 104-8 at 4.)

Allmond's medical examination was reviewed by the Judicial Security Division on February 25, 2003. Following that review, Allmond's status was given as "medical determination deferred pending further documentation." (Defs.' Materials Supp. Mot. Summ. J., Doc. 78-23 at 9.) Allmond was advised that his pure tone audiogram did not meet the required standards. He was further advised to see an ear, nose and throat physician for additional testing. (Id.)

Allmond provided supplemental medical information on March 26, 2003. (Id. at 11.) The supplemental medical information was reviewed by the Judicial Security Division on April 25, 2003. (Id.) Based on the review of the supplemental medical information, Allmond's status remained "medical determination deferred pending further documentation." (Id.) The reviewing physician, Louis Chelton, determined that Allmond's unaided speech recognition in quiet did not meet the required standard. (Id.) Dr. Chelton requested that additional information be provided by an audiologist. (Id.) During the time that Allmond's

medical status with regard to his hearing was under review Allmond was allowed to begin working for Akal.

The additional hearing information requested by Dr. Chelton was provided on May 8, 2003. (Id. at 12.) Dr. Chelton reviewed the medical information on June 17, 2003, and determined that Allmond was not medically qualified to perform the essential functions of the job. Specifically, Dr. Chelton concluded,

> *The following medical condition(s) poses a significant risk to the health and safety of yourself and/or others in the performance of essential job functions.*
>
> According to the results of the tests provided by you from your audiologist, you have a severe conversational hearing loss. The tests confirm your decreased ability to distinguish speech in the absence of background noise (speech discrimination in quiet of 84% right and 68% left). Your impairment in performing this essential law enforcement function poses a significant threat to the health and safety of yourself, other law enforcement officers, and the public.

(Id.)

Although Dr. Chelton determined on June 17, 2003, that Allmond was not medically qualified to perform the essential functions of the job, no immediate action was taken by Akal and Allmond continued to work as a CSO at the Columbus courthouse until February 3, 2004. It is undisputed that during the period that Allmond worked at the courthouse he did his job very well and never had any problems related to his hearing or otherwise. Allmond never owned or wore hearing aids during his employment with Akal. He obtained hearing aids for the first time in 2005. (Allmond Dep. at 22-23, 64.) At that time he obtained hearing aids for both ears. (Allmond Dep. at 82.)

On December 19, 2003, Allmond underwent his annual fitness for duty physical examination. The physical examination included a hearing test. The audiologist who conducted the December 19, 2003, exam noted that "[a]udiometric testing revealed similar test results as found on 3/20/2003." (Pl.'s Summ. J. Evid., Doc. 104-9 at 1.) As to the audiometric testing, the audiologist further noted:

> borderline normal hearing in the right ear, dropping to a mild sensorineural hearing loss at 2000 Hz and further dropping to a severe to profound sensorineural hearing loss in the high frequencies. Left ear test results indicate normal hearing, dropping to a mild sensorineural hearing loss at 500 and 1000 Hz and further dropping to a severe sensorineural hearing loss in the high frequencies. Excellent word recognition scores when words were presented at amplified levels.

(Id. at 1-2.) Allmond considered the December 19, 2003, test results to be good, (Allmond Aff., Doc. 104-17 ¶ 4), but also conceded that he has a limited understanding of the tests and forms that were used. (Allmond Dep. at 19-20.)

In a letter dated February 2, 2004, Akal was advised by the United States Marshals Service that Allmond did not meet the contract medical requirements for a CSO. (Pl.'s Summ. J. Evid., Doc. 104-9 at 4.) The contracting officer who wrote the letter, Maxine Robinson, informed Akal that Almond was to be removed immediately from his position under the CSO contract. (Id.) In a letter dated February 3, 2004, Akal advised Allmond of the communication from the Marshals Service and further advised him that he was "medically disqualified" from the CSO position and, therefore, terminated from employment effective immediately. (Id. at 3.)

After Allmond received notice of his termination, he contacted a human resources

officer for Akal and asked her to explain the basis of the decision to terminate his employment. (Allmond Dep. at 57.) He claims that she told him that he was being terminated on the basis of his initial hearing test. (Allmond Dep. at 57.) He then asked if he could use hearing aids. (Allmond Dep. at 57.) According to Allmond, he was told, "Hearing aids don't count." (Allmond Dep. at 57-58.)

Believing that the decision to terminate him was unlawful, Allmond sued Akal and the United States Marshals Service. Allmond contends that the Government's requirement that he pass a hearing test without a hearing aid is a screening test that screens out the disabled. (Compl. ¶ 14). It is Allmond's contention that Defendants' actions against him served to violate the Americans with Disabilities Act, 42 U.S.C.A. § 12112(b)(6), and the Rehabilitation Act of 1973, 29 U.S.C.A. §§ 701 to 796*l*. (Compl. ¶ 20.)[2]

After engaging in discovery, the parties filed the Motions that are the subject of this Order. In their Motion for Summary Judgment, Defendants argue they are entitled to judgment as a matter of law as to all issues raised by the Complaint. In his Motion for Partial Summary Judgment, Allmond seeks judgment as a matter of law on three grounds: 1) that he has a disability in that he was regarded as having a substantial hearing impairment; 2) the Government's limitations on the use of hearing aids for testing purposes violate the law; and 3) Akal is liable for the Government's violations of disability law. The court will address

---

[2] Discrimination claims under the Rehabilitation Act are governed by the same standards used in ADA cases. *See* 29 U.S.C. § 794(d) *and* <u>Cash v. Smith</u>, 231 F.3d 1301, 1305 (11th Cir. 2000). Therefore, the Court will hereinafter refer to Allmond's claims as having been brought under the ADA, but the discussion applies equally to the Rehabilitation Act claims.

the parties' contentions below.

## II. CONCLUSIONS OF LAW

Congress enacted the Americans with Disabilities Act in order to, among other things, "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C.A. § 12101(b)(1) (West 2005). In enacting the ADA, Congress expressed its intent to address discrimination based on stereotypical notions about disabilities. Id. § 12101(a)(7). Toward that end, Congress defined "disability" under the ADA to include not only those individuals with physical or mental impairments, but also those individuals regarded as having such impairments. Id. § 12102(2).

In its efforts to address disability discrimination, Congress extended the ADA to employers, enacting the following general rule:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

Id. § 12112(a). Thus, an individual who seeks to make a claim under the ADA that he was discriminated against under the "general rule," that is to say in the "terms, conditions, and privileges of employment" (the classic disparate treatment case), must show that he was a qualified individual with a disability and that his employer intentionally discriminated against him because of the disability. See, e.g., Cash v. Smith, 231 F.3d 1301, 1305 (11th Cir. 2000) ("In order to establish a prima facie case of discrimination under the ADA, [a plaintiff] must demonstrate that [he] (1) is disabled, (2) is a qualified individual, and (3) was subjected to

8

unlawful discrimination because of [his] disability.").

If an ADA plaintiff proceeding under the general rule can satisfy a prima facie case of discrimination, then the burden-shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973), comes into play. *See* Carlson v. Liberty Mut. Ins. Co., No. 06-15417, 2007 WL 1632267, *1 (11th Cir. June 7, 2007) (unpublished op.) (holding that burden-shifting analysis of McDonnell Douglas Corp. applies in ADA cases). Under this standard, the burden would shift to the defendant employer to offer a legitimate, nondiscriminatory reason for its employment decision. If it does so, the burden shifts back to the plaintiff to show that the proffered reason for the employer's decision was pretextual.

The general rule, however, is only that, a general rule. In defining employment discrimination under the ADA, Congress extended it to cover situations that do not fall within the traditional disparate treatment framework, including the following:

> using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity.

42 U.S.C.A. § 12112(b)(6) (West 2005). Numerous federal appellate circuit courts have declined to apply the McDonnell Douglas analysis to claims brought pursuant to § 12112(b)(6). In Davidson v. America Online, Inc., 337 F.3d 1179 (10th Cir. 2003), the court explained that the burden-shifting framework "may be unnecessary and inappropriate" if the "employer admits that the disability played a prominent part in the decision, or the plaintiff has other direct evidence of discrimination based on disability." Id. at 1189. The

court further explained:

> Instead, an employer will defend its decision on the ground that plaintiff is not otherwise qualified for the position, with or without reasonable accommodation. The *McDonnell Douglas* burden shifting approach is unnecessary because the issue of the employer's intent has been admitted and the plaintiff has direct evidence of discrimination on the basis of his disability. If the plaintiff in such a case is in fact statutorily disabled, the determinative issue in the case will not be the employer's intent, but whether the employee is 'otherwise qualified,' with or without reasonable accommodation, to perform the job, a factual dispute that is resolved through traditional methods of proof.

Id. (citing Monette v. Elect. Data Sys. Corp., 90 F.3d 1173, 1182 (6th Cir. 1996)). In Davidson, the court held that because the employer relied on the employee's disability when it took an adverse action against him, the McDonnell Douglas framework was inapplicable. Id. Instead, the court considered only whether the employee was a qualified individual, as defined by the ADA. Id.

The parties have briefed the motions in terms of both the traditional McDonnell Douglas framework and the disparate impact theory. Therefore, this Court must first determine what framework to apply in analyzing Allmond's claims. The starting point for the Court's analysis is Plaintiff's complaint, which is remarkably simple: He alleges that he brings his complaint pursuant to the ADA and the Rehabilitation Act (Compl. ¶ 5); that he worked as a CSO but was terminated because he was told he was not medically qualified for the job (Compl. ¶ 12); that he was qualified for the job (Compl. ¶ 13); that Akal and the Government unlawfully dismissed him on the basis of screening criteria that screens out the disabled (Compl. ¶ 14); that with the assistance of hearing aids he meets the standards set by

the USMS (Compl. ¶ 15); and that in prohibiting him from using hearing aids, Defendants have violated the Rehabilitation Act and that portion of the ADA that prohibits employers from using qualification standards that screen out the disabled, 42 U.S.C. § 12112(b)(6) (Compl. ¶ 20).

Review of the complaint thus reveals that Allmond is alleging that Akal and the Government unlawfully discriminated against him by employing a screening criteria that screens out the disabled in violation of 42 U.S.C.A. § 1211(b)(6) (West 2005). Claims brought pursuant to § 12112(b)(6) are treated as disparate impact claims. *See* Davidson, 337 F.3d at 1189 (describing claims brought under § 12112(b)(6) as claims brought under a disparate impact theory); Erickson v. Bd. of Governors, 207 F.3d 945, 949 (7th Cir. 2000) (explaining that § 12112(b)(6) defines criteria with disparate impacts as discrimination); Boersig v. Union Elec. Co., 219 F.3d 816, 822 (8th Cir. 2000) (discussing § 12112(b)(6) claim as "invoking a disparate impact theory of ADA liability"); Gonzales v. City of New Braunfels, Tx., 176 F.3d 834, 839 (5th Cir. 1999) (noting that the disparate impact theory of discrimination "has been adopted entirely by the ADA" and citing to §§ 12112(b)(3) & (6)); Matthews v. Commonwealth Edison Co., 128 F.3d 1194, 1196 (7th Cir. 1997) (noting that disparate impact approach to proving discrimination is applicable to cases under the ADA and citing to § 12112(b)(6)) *and* Monette v. Elec. Data Sys. Corp., 90 F.3d 1173, 1179 n.5 (6th Cir. 1996) (describing § 12112(b)(6) cases as "analytically similar to Title VII disparate impact claims").

Under a disparate impact challenge to an employer's action, the plaintiff in an ADA

case need not prove that the employer intended to discriminate.  <u>Erickson</u>, 207 F.3d at 950.

Instead, the ADA places the burden on the employer to show that its practice is "job-related

for the position in question and is consistent with business necessity."  42 U.S.C.A.

§ 12112(b)(6) (West 2005); <u>Erickson</u>, 207 F.3d at 950.  The United States Court of Appeals

for the Fifth Circuit has explained that a plaintiff makes out an ADA claim of disparate

impact discrimination by (1) identifying the challenged employment practice or policy, and

pinpointing the employer's use of it; (2) demonstrating an adverse impact on himself or a

group that falls within the protections of the ADA; and (3) demonstrating a causal

relationship between the challenged practice and the disparate impact.  <u>Gonzales</u>, 176 F.3d

at  839 n.26.  The Sixth Circuit has explained that in disparate impact cases, the employer

bears the burden of proving that a particular job requirement is necessary, while the disabled

individual always bears the burden of proving that he is "otherwise qualified" for the position

in question.  <u>Monette</u>, 90 F.3d at 1184.

Although the parties have addressed some of the issues within the <u>McDonnell Douglas</u>

framework, the Court is of the opinion is that this case should be analyzed under the disparate

impact framework.  Accordingly, the Court will consider whether Allmond belongs to the

class of persons protected by the ADA, i.e., whether is an individual with a disability who

is otherwise qualified for the position in question.  If he is, Defendants must show that the

hearing standard at issue here is a business necessity.

**A.    Individual with a Disability**

12

The Act defines the term "disability" with respect to an individual as follows: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C.A. § 12102(2) (West 2005).  Given the foregoing definition, an individual who seeks to state a claim under the ADA "must have an actual disability (subsection (A) [of 42 U.S.C.A. § 12102(2)]), have a record of a disability (subsection (B)), or be regarded as having one (subsection (C))."  Sutton v. United Airlines, Inc., 527 U.S. 471, 478, 119 S. Ct. 2139, 2144 (1999).

In this case, no argument is made that Allmond has a record of a physical or mental impairment that substantially limits one or more of the major life activities.  Furthermore, Allmond does not argue that he has a physical or mental impairment that substantially limits one or more of the major life activities.[3]  Rather, Allmond contends he has a disability as defined by the Act because Defendants regarded him as having a physical limitation that substantially limits a major life activity.  The Supreme Court of the United States has

---

[3] To the contrary, Allmond's argument is that he does not have a disability.  He maintains that while he was working with Akal, he had no limitations on his ability to function as a CSO, and he continues to maintain that he is able to function without limitations in the major life activities. (Allmond Dep. at 61-64.)  Moreover, Allmond's argument throughout this litigation has been that "with the assistance of hearing aids . . . he meets the hearing standards set by the U.S. Marshal's Service" (Compl. ¶ 15), thereby suggesting that the use of corrective measures would eliminate any limitations he might have on his hearing.  When corrective measures will allow an individual whose impairment might constitute a disability to function identically to individuals without a similar impairment, then that person is not disabled within the meaning of the ADA.  See Sutton v. United Airlines, Inc., 527 U.S. 471, 488-89, 119 S. Ct. 2139, 2149 (1999) (holding that "disability under the Act is to be determined with reference to corrective measures," and petitioners whose visual limitations could be corrected with corrective lenses could not state a claim that they were substantially limited in any major life activity).

explained that there are two ways in which an individual may be regarded as substantially limited in a major life activity: "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." Sutton, 527 U.S. at 489, 119 S. Ct. at 2139. The Court further explained: "In both cases, it is necessary that a covered entity entertain misperceptions about the individual–it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting." Id.

Here, Allmond contends Defendants regarded him as being substantially limited in the major life activities of hearing and working. The Court will address each of these contentions.

### 1.     The Major Life Activity of Hearing

In support of his contention that Defendants regarded him as substantially limited in the major life activity of hearing, Allmond points to Dr. Chelton's determination, in his review dated June 17, 2003, that Allmond had "a severe conversational hearing loss." Allmond also relies on Defendants' interrogatory responses, in which Defendants stated the following:

> Based upon Mr. Allmond's medical records and hearing test results, [the Federal Occupational Health Law Enforcement Medical Program] made the medical determination that Mr. Allmond's hearing deficiency rendered him

unable to perform adequately, or presented too great a risk of him not being able to perform adequately, the following essential job functions of the CSO position.

(Pl.'s Summ. J. Evid., Doc. 101-19.)  The interrogatory response then identified the essential job functions listed below:

to comprehend speech during face-to-face conversations;

to comprehend speech during telephone conversations;

to comprehend speech during radio transmissions;

to distinguish higher frequency tones such as fire alarms and smoke detectors;

to comprehend speech and distinguish sounds in loud and/or reverberant environments such as courthouse lobbies or in emergency situations; and

to comprehend speech when he did not have eye contact with the speaker.

(Id.)  Allmond contends that by taking the position that Allmond's known hearing limitations–identified by Defendants as a severe conversational hearing loss–rendered him unable to perform the foregoing essential job functions, Defendants regarded him as being substantially limited in the activity of hearing.

Defendants take the position that there is no evidence that they viewed Allmond as substantially limited in his ability to hear.  They contend that the determination by Chelton that Allmond had a "severe conversational hearing loss" is not "equivalent to a perception that [Allmond] could not hear" but, instead, was a determination that Allmond failed to meet the requirement that he be able to hear 90% of the spoken words out of each ear when tested in quiet.  (Def.'s Am. Mem. Supp. Mot. Summ. J., Doc. 79 at 21.)  In support of their

position, they have provided, among other things, the declaration of Louis Chelton, in which he states that when he used the phrase "severe conversational hearing loss," he did not intend to indicate that Allmond was impaired in his ability to hear generally. (Chelton Decl. ¶ 6, Doc. 78-23.)

In the Court's view, issues of fact remain for determination by a jury as to whether Defendants regarded Allmond as substantially limited in the major life activity of hearing. Defendants' intent in declaring Allmond to have a "severe conversational hearing loss" is a matter for a jury to decide. Therefore, insofar as Plaintiff's Motion for Summary Judgment requires a determination that Defendants regarded him as substantially limited in the major life activity of hearing, that Motion is denied.


### 2. The Major Life Activity of Working

In addition to contending that Defendants regarded him as substantially limited in the major life activity of hearing, in a footnote (Pl.'s Mot. Partial Summ. J., Doc. 80-1 at 6 n.4), Allmond contends he is entitled to judgment as a matter of law on the issue of whether Defendants regarded him as substantially limited in the major life activity of working. Allmond contends that the limitations perceived by Defendants on Allmond's hearing ability, particularly his inability to comprehend speech during face-to-face conversations, would preclude him from working in all law enforcement jobs. Defendants have moved for summary judgment on this issue, as well, contending they are entitled to judgment as a matter

of law on the issue of whether they viewed him as substantially limited in his ability to work.

The Supreme Court has never issued an opinion in which it has concluded that working is a major life activity under the ADA. However, decisions of the Eleventh Circuit treat working as a major life activity. *See, e.g.,* Mullins v. Crowell, 228 F.3d 1305, 1313 (11th Cir. 2000) (noting that precedent treating working as a major life activity is still valid after Sutton and holding that district court erred by interpreting the Rehabilitation Act to the contrary). Therefore, this Court will likewise treat working as a major life activity for purposes of the ADA and Rehabilitation Act claims at issue here.

In order to prevail under the theory that he was regarded by Defendants as being substantially limited in the major life activity of working, Allmond must show that as a result of the perceived disability he was "'significantly restricted in the ability to perform either a *class of jobs or a broad range of jobs* in various classes as compared to the average person having comparable training, skills and abilities.'" Rossbach v. City of Miami, 371 F.3d 1354, 1359 (11th Cir. 2004) (quoting 29 C.F.R. § 1630.2(j)(3)(i)). In Rossbach, the court further emphasized the following:

> The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working. Thus, an impairment must preclude–or at least be perceived to preclude–an individual from more than one type, even if the job foreclosed is the individual's job of choice.

Id. at 1359 (citing Sutton, 527 U.S. at 492, 119 S. Ct. at 2151). In Rossbach, the court held that the job of "police officer" is "too narrow a range of jobs to constitute a 'class of jobs' as that term is defined in the EEOC regulations." Id. at 1361. The court upheld the district

17

court's determination that the plaintiff police officer in <u>Rossbach</u> failed to demonstrate that his physical impairments substantially limited a major life activity.

Unlike the plaintiff in <u>Rossbach</u>, here Allmond argues that Defendants perceived his physical impairments as precluding him from working in the field of law enforcement, not just in the CSO position.  He contends that this result is demonstrated by the testimony of Defendants' witnesses in which they concede that, in general, law enforcement officials need to be able to satisfy the essential job functions that they determined Allmond was unable to perform as a CSO.  Some of the evidence on which Allmond relies for this contention is set out below:

(1) The deposition of Dr. Richard Miller, taken in a different case against the same Defendants, from which the following exchange was excerpted:

Q       Now, do you, as the doctor, the occupational medicine doctor who is the head of the Law Enforcement Medical Program for the United States government, does comprehend speech mean something other than – other – other than understanding speech to you?

A.       No.

Q.       Okay.  And going down that list, using the words you used as a general proposition, you agree that for weapons-carrying law enforcement people, they need to understand speech on the telephone, too, don't they?

A.       Yes.

Q.       And they need to be able to understand speech during radio

transmissions, don't they?

    A.     Yes.

    Q.     And they need to be able to understand speech when their vision is blocked from seeing the person talking?

    A.     Yes.

    Q.     Okay. And hear sounds that require investigation?

    A.     Yes.

    Q.     That's common to law enforcement, isn't it?

    A.     In general it is common.

(Pl.'s Summ. J. Evid., Ex. U, Doc. 104-2 at 2.)

2) The deposition of Thomas Galgon, the United States Marshal's Service's Chief Inspector of Judicial Protective Services, taken on November 18, 2005, from which the following exchange was excerpted:

    Q.     Would you anticipate as a security professional that the vast majority of people in law enforcement work would need to be qualified to comprehend speech during radio transmissions?

    THE WITNESS:   Again it would depend on whether their responsibilities included carrying a radio and being able to do that.

    Q.     Isn't it your understanding that most law enforcement officers do carry radios?

    THE WITNESS: Yes, I would agree that most police officers carry

radios.

> Q. So if someone is not able to comprehend speech during radio transmissions, they would not be well suited for law enforcement work; is that a fair statement?

> THE WITNESS: I think that they would not be able to perform in a job that required them to carry a radio and comprehend radio transmissions.

(Pl.'s Summ. J. Evid., Ex. FF, Doc. 104-15 at 2.)

3) The deposition of Doctor Louis Chelton, taken in this case on October 27, 2005, from which the following exchange was excerpted:

> Q. (By Mr. Griffin) Right. Am I right in saying it's important that we – that law enforcement people be able to discriminate or understand speech even in a noisy background sometimes?

> A. Correct.

(Pl.'s Summ. J. Evid., Ex. JJ, Doc. 104-19 at 1.)

4) The Declaration of Dr. Carl Hansen, a vocational rehabilitation counselor, who asserted the following on July 27, 2006:

> My professional opinion is that if Mr. Almond's hearing impairment existed as perceived by the U.S.M.S. (i.e. caused him to have "severe conversational hearing loss" which in turn kept him from being able to understand face to face conversations and have telephone conversations), that he would be precluded from virtually all jobs in the class of jobs of law enforcement. This is because virtually every law enforcement job requires the ability to understand face to face conversations and telephone conversations. Thus if Mr. All[]mond's hearing was as poor as the U.S.M.S. perceived it, he would not be able to work in the class of jobs of law enforcement.

(Pl.'s Summ. J. Evid., Ex. KK, Doc. 104-20 at 2.)

Defendants take the position that the evidence establishes that the Government perceived Allmond only as unable to hear at a level sufficient to satisfy the CSO hearing standard and that the Government did not necessarily view Allmond as limited in performing a class of law enforcement jobs. (Defs.' Reply Pl.'s Resp. Def.'s Mot. Summ. J., Doc. 107-1 at 5.) Defendants assert that in order for Allmond to prevail as to this issue, he must come forward with evidence that the hearing standards employed by the Government for its CSOs are the same hearing standards employed by at other law enforcement agencies. (Defs.' Reply Pl.'s Resp. Def.'s Mot. Summ. J. at 6.) The Court disagrees.

In the Court's view there is sufficient evidence in the record from which a jury could conclude that Defendants perceived Allmond's physical impairments as precluding him from working in the field of law enforcement. It is not necessary, as Defendants suggest that Plaintiffs put forth evidence that other law enforcement agencies utilized the same standards as those employed by the Government with respect to Allmond. It is enough that there is evidence in the record to show that the Government perceived Allmond as having a severe hearing loss; that the impairment prevented him from performing essential functions of the job, including comprehending speech during face-to-face conversations and during telephone conversations and radio transmissions; and that these same functions were essential to working in the field of law enforcement. Therefore, Defendants' Motion for Summary Judgment is denied as to this issue. To the extent that Allmond also seeks summary judgment as to that issue, fact issues preclude summary judgment, and Plaintiff's Motion is

thus denied on the issue of whether Defendants regarded Allmond as substantially limited in the major life activity of working.

### B.    Otherwise Qualified.

Because this Court has concluded that fact issues exist with respect to whether Allmond had a disability as that term is defined under the ADA, the Court must next consider whether Allmond can show that he was otherwise qualified for the position.  A qualified individual

> means an individual with a disability who satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires, and who, with or without reasonable accommodation, can perform the essential functions of such position."

29 C.F.R. § 1630.2(m) (2006).  "Determining whether a particular job duty is an essential function involves a factual inquiry to be conducted on a case-by-case basis." Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1258 (11th Cir. 2001).  In deciding whether a particular job duty is an essential function, consideration is to be given to the employer's judgment.  Id. Evidence of whether a particular function is essential can also include the consequences of not requiring the individual to perform the function.  29 C.F.R. §1630.2(n)(3)(iv) (2006).

Although the regulations define a qualified individual as one who can perform the essential functions of the position, there is considerable debate among the circuits with respect to whether a disparate impact plaintiff must also show that he was qualified to perform the essential function challenged under 42 U.S.C.A. § 12112(b)(6).  At least two circuits have concluded that a plaintiff challenging a qualification standard under

§ 12112(b)(6) need not also show that he was a "qualified individual" under the general rule of § 12112(a), which provides, in part, that no covered entity shall discriminate against a qualified individual with a disability. *See* <u>Bates v. UPS</u>, 465 F.3d 1069, 1081 (9th Cir. 2006), *rehearing en banc granted*, (discussing burdens under the ADA and holding that a plaintiff challenging a standard under § 12112(b)(6) does not bear the burden of proving that he is qualified as to the essential job function the standard addresses) *and* <u>Monette</u>, 90 F.3d at 1184 (holding that in a claim brought pursuant to § 12112(b)(6), plaintiff bears the burden of showing he is disabled and qualified to perform the essential functions of the job, absent the challenged job requirement). *But see* <u>Davidson</u>, 337 F.3d at 1188-89 (noting § 12112(b)(6) as a distinct type of ADA discrimination, but stating, "No matter what type of discrimination is alleged, however, a plaintiff must establish first that he was a 'qualified individual with a disability.'").

This Court adopts the reasoning of the Ninth and Sixth Circuits and finds that in order to bring a challenge under § 12112(b)(6), Allmond does not bear the burden of proving that he is qualified as to the job function addressed by the allegedly illegal qualification standard. Consistent with the Sixth and Ninth Circuits, this Court will only require Allmond to show that he is disabled and qualified to perform the essential functions of the job, absent the challenged job requirement–in this case the ability to pass the required hearing test without the use of hearing aids. Under this standard, Allmond has shown that he is otherwise qualified.

Defendants do not take issue with Allmond's ability to perform the essential functions

of the job–except insofar as those essential functions stem from his inability to pass the hearing test unaided. In other words, except as to the hearing standard challenged by Allmond as unlawful under § 12112(b)(6), Defendants do not dispute that Allmond was qualified for the job. This Court has already determined that, for purposes of this disparate impact claim, Allmond need not prove that he was qualified as to that function. Therefore, Allmond has shown that he is a otherwise qualified for the position.

### C. Business Necessity Defense

Because Allmond has shown that he is a qualified individual and the Court has determined that fact issues exist with respect to whether he had a disability, the Court must next consider whether Defendants can meet their burden of proving that the particular standard, employment test, or other selection criteria is "job-related for the position in question and is consistent with business necessity." 42 U.S.C.A. § 12112(b)(6) (West 2005). These terms are not easily defined or applied in the ADA context. Therefore, this Court will follow the lead of the United States District Court for the District of Kansas and apply the business necessity principles used in Title VII disparate impact cases. Riechmann v. Cutler-Hammer, Inc., 183 F. Supp. 2d 1292, 1296 (D. Kan. 2001) (analyzing federal regulations and determining that regulations require consideration of analogous Title VII cases in Rehabilitation Act cases in which employer uses tests or other selection criteria to screen out handicapped persons).

In Griggs v. Duke Power Co., 401 U.S. 424, 91 S. Ct. 849 (1971), the Supreme Court held that the business necessity defense in Title VII cases "placed on the employer the burden

of showing that any given requirement must have a manifest relationship to the employment in question." Id. at 432, 91 S. Ct. at 854. With regard to employment tests, the Court also stated that with Title VII, Congress has commanded "that any tests used must measure the person for the job and not the person in the abstract." Id. at 436, 91 S. Ct. at 856.

In 1984, the Eleventh Circuit had the occasion to discuss the business necessity defense at length. In Walker v. Jefferson County Home, 726 F.2d 1554, 1558 (11th Cir. 1984), the court offered the following discussion of the standard and the relevant caselaw:

> In determining whether the employer has met its burden, the court looks at the amount of skill required for the position and the economic and human risks involved. "When a job requires a small amount of skill and training and the consequences of hiring an unqualified applicant are insignificant, the courts should examine closely any pre-employment standard or criteria which discriminate against minorities. In such a case, the employer should have a heavy burden to demonstrate to the court's satisfaction that his employment criteria are job-related." Spurlock v. United Air Lines, Inc., 475 F.2d 216, 219 (10th Cir.1972). *See* EEOC v. International Union of Operating Engineers, Local 14 & 15, 553 F.2d 251 (2d Cir.1977) (union admission requirements of city operator's license, ability to operate more than one piece of equipment, and 200 days' experience were not job related); Fisher v. Proctor & Gamble Mfg. Co., 613 F.2d 527, 541-42 n. 27 (5th Cir.1980), *cert. denied*, 449 U.S. 1115, 101 S. Ct. 929, 66 L. Ed.2d 845 (1981) (injunction against 20-year experience requirement for promotion from nonmanagement to management positions upheld in view of racial impact); Pettway v. American Cast Iron Pipe Co., 576 F.2d 1157 (5th Cir.1978), *cert. denied*, 439 U.S. 1115, 99 S. Ct. 1020, 59 L. Ed.2d 74 (1979) (experience prerequisite for eligibility for apprenticeship program and on-the-job training found to perpetuate effects of past discrimination; district court ordered to consider whether experience prerequisite should be shortened). *Compare* Spurlock v. United Air Lines, Inc., 475 F.2d 216 (10th Cir.1972) (job of airline flight officer requires high degree of skill, and economic and human risks are great); Hodgson v. Greyhound Lines, Inc., 499 F.2d 859 (7th Cir.1974), *cert. denied*, 419 U.S. 1122, 95 S. Ct. 805, 42 L. Ed.2d 822 (1975) (requirement that applicants for bus-driving position be younger than 35 years of age upheld on safety grounds).

Id. at 1558-59. Applying the factors discussed in Griggs and Walker, the Court finds that Defendants have shown that hearing requirements challenged by Allmond were job-related for the CSO position and consistent with business necessity.

The evidence unequivocally shows that Defendants undertook a study of the CSO position, that they engaged a physician experienced in law enforcement to lead the study, and that based on his recommendations, the standard at issue here was put in place. While the results of that study served to limit the employment of certain persons whose hearing fell below the designated standard, it did not foreclose entirely on the employment of those persons with hearing aids. Specifically, those persons whose hearing enabled them to meet the minimum threshold unaided were allowed to work with hearing aids, if they also satisfied those tests designed to ensure that the hearing aids were functioning properly.

Allmond heavily criticizes Defendants for setting standards based on events that may never occur, such as confrontations that might result in hearing aids being dislodged, but the human risks that are present with the CSO position not only permit such "what if" thinking, they demand it. It is the job of the CSO to be prepared for any occurrence. Likewise, it is the job of the Marshals Service to ensure that its CSOs are capable of meeting any occurrence, whether or not foreseeable. As to Allmond's suggestions to the contrary, the Court finds the reasoning of the United States District Court for the Southern District of Indiana in Leverett v. City of Indianapolis, 51 F. Supp. 2d 949 (S.D. Ind. 1999), to be persuasive.

In Leverett, the plaintiff challenged the City of Indianapolis's requirement that

firefighters be capable of a minimum level of hearing in both ears.  The City maintained that

the plaintiff's inability to localize sound would present a safety risk; the plaintiff challenged

the medical basis for the City's conclusions.  In finding for the City, the district court had this

to say:

> The City's hearing test was not created arbitrarily, but rather was based upon
> the well supported medical opinion that the ability to hear in both ears relates
> directly to one's ability to localize sound and thus to perform the essential
> functions of a firefighter. . . .
>
> . . . .
>
> Plaintiff argues that such an opinion is not universally held in the
> medical community . . . and that some applicants with unilateral hearing may
> be able to localize sounds sufficiently well to perform their jobs.  This may
> well be true, but the law does not require the City to put the lives of [plaintiff],
> his fellow firefighters, and the citizens they serve at risk by taking the chance
> that he can localize sound . . . .The lack of a precise or universally perfect fit
> between a job requirement and actual safe and effective performance is not
> fatal to a claim of job-relatedness, particularly when the public health and
> safety are at stake.

Id. at 958.

The Tenth Circuit has also noted that courts may consider risks to public health and

safety when considering whether a particular standard is justified by business necessity.  As

the court noted in Spurlock v. United Airlines, Inc., 475 F.2d 216, 219 (10th Cir. 1972),

when determining whether defendants' hiring requirements for an airline flight officer were

a business necessity, "when . . . the human risks involved in hiring an unqualified applicant

are great, the employer bears a correspondingly lighter burden to show that his employment

criteria are job-related."   Id. at 219.  With respect to the importance of the airline flight

officer position, the court added, "The public interest clearly lies in having the most highly qualified persons available to pilot airliners. The courts, therefore, should proceed with great caution before requiring an employer to lower his pre-employment standards for such a job." Id. The same analysis applies to the CSO position.

In the employment discrimination setting, courts have been loathe to impose their judgment concerning personnel matters on defendant employers. As far back as 1991, the Eleventh Circuit adopted the view of the Seventh Circuit, noting in a Title VII case, "Federal courts 'do not sit as a super-personnel department that reexamines an entity's business decisions.'" Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991) (quoting Mechnig v. Sears, Roebuck & Co., 864 F.2d 1359, 1365 (7th Cir. 1988)). Other circuits have applied the same rationale to ADA cases. *See, e.g.,* Henderson v. Ford Motor Co., 403 F.3d 1026, 1034 (8th Cir. 2005).

As the Seventh Circuit noted in Erickson, the ADA only condemns irrational distinctions based on disabilities. Erickson, 207 F.3d at 949. Where, as here, a defendant relies on objectively reasonable medical evidence to conclude that a distinction based on a disability is necessary to protect the health and safety of the public, then an adverse action taken against an employee based on that distinction is not unlawful. In sum, Defendants have shown that the action challenged by Allmond is consistent with business necessity. As a result they are entitled to summary judgment as to his ADA claim brought pursuant to § 12112(b)(6). *See, e.g.,* Lee v. Fla., Dep't of Children & Family Servs., No. 03-16180, 2005 WL 139508, *2 (11th Cir. Apr. 27, 2005) (unpublished op.) (assuming prima facie showing

by plaintiff in Title VII case, but granting summary judgment based on defendant's showing of business necessity).

## III.   CONCLUSION

In view of the foregoing, therefore, the Court finds that Defendants have demonstrated as a matter of law that the hearing standards challenged by Allmond were job-related and consistent with business necessity.   As a result, Defendants have presented a successful defense to Plaintiff's employment discrimination claim and, therefore, Defendants' Motion for Summary Judgment is granted; Plaintiff's Motion for Summary Judgment is denied.

**SO ORDERED**, this the 28th day of September, 2007.


*s/    Hugh Lawson*
**HUGH LAWSON, JUDGE**

mls